**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**APPROXIMATELY 5,018,405.451351 USDT**<br><br>**Defendant, *in rem.*** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **COMPLAINT FOR FORFEITURE *IN REM***<br><br>***CIVIL ACTION NO.***<br>**26-cv-3301** |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against 5,018,405.451351 USDT, hereinafter referred to as "Defendant Property", and alleges as follows:

**STATEMENT OF THE CASE**

1. Criminals believed to be located abroad, their associates, and conspirators together defrauded multiple U.S. victims in cryptocurrency investment fraud schemes. The proceeds were then laundered through a series of virtual currency addresses, consolidated with other victims' funds, frequently exchanged using a virtual currency exchange and transferred from one blockchain to another, and then laundered through additional virtual currency addresses to evade detection and hide the origin of the funds. The Defendant Property includes proceeds traceable to fraud and constitutes property involved in, and traceable to, this money laundering scheme.

2. The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities, and most importantly, to recover assets that may be used to compensate victims.[1]

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

**JURISDICTION AND VENUE**

3. This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4. This Court has in rem jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b).

5. Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(2) because the property is subject to forfeiture under the laws of the United States and is controlled by Tether International S.A. de C.V. ("Tether"), which is domiciled in the country of El Salvador.

**NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE**

6. The United States files this *in rem* forfeiture action to seek forfeiture of Defendant Property as constituting proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343, 1349, 2, and 3, and as involved in money laundering and money laundering offenses, committed in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i), (h), 2, and 3.

7. Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

8. 18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

9. 18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to wire fraud, conspiracy to commit wire fraud, or any offense constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such

offense. A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

10. 18 U.S.C. § 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

11. 18 U.S.C. § 1349 provides that whoever attempts or conspires to commit a violation of 18 U.S.C. § 1343 shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

12. 18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty of concealment of money laundering.

13. 18 U.S.C. § 1956(a)(2)(B)(i) provides that whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, commits international money laundering.

14. 18 U.S.C. § 1956(h) provides that any person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

**PROPERTY INFORMATION**

15. The Defendant Property is 5,018,405.451351, which is the equivalent to $5,018,405.451351 in U.S. dollars (USD). The Defendant Property is associated with virtual currency addresses: TAK4tfx8HZNRN3TpzLE7JxW4SG5vGH6H9M (Subject Address 1), TWGpSCmX73hs81wnEYVvUbbwTWytEihnVQ (Subject Address 2), and TXUdpqNax3ZDc63HkStvKVbPkVxNjaufhG (Subject Address 3) (collectively the Subject Addresses"), which collectively hold 5,018,405.451351 USDT as of September 16, 2026. The virtual currency associated with the Subject Addresses is hereinafter referred to as the "Defendant Property."

16. The United States has yet to take custody and control over the Defendant Property.

## STATEMENT OF FACTS

### Background on Cryptocurrency

17. **Virtual Currency**: Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

18. **Blockchain**: A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all of their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

19. **Blockchain Analysis**: Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open-source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

20. **Blockchain Bridge**: A bridge protocol, also known as a cross-chain bridge, is a software application that enables the direct transfer of assets/value across different blockchains (e.g., from the Bitcoin blockchain to the Ethereum network). When a bridge protocol user initiates a transaction from one blockchain to another, the user specifies the number of coins or tokens (i.e., the value) that the user would like to send from the originating blockchain to the destination blockchain.

21. **Virtual Currency/Cryptocurrency Address**: A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

22. **Virtual Currency/Cryptocurrency Exchange**: A virtual currency exchange ("VCE"), also called a cryptocurrency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

23. **Virtual Currency/Cryptocurrency Wallet**: A virtual currency wallet (e.g., a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

24. **Unhosted Wallet**: An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (e.g., a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own virtual currency addresses.

25. **Decentralized Exchange**: A decentralized exchange (or "DEX") is a peer-to-peer marketplace where users can trade virtual currencies directly with other traders without centralized intermediaries. Users generally retain control over their virtual currency rather than entrusting a central authority to host funds in a centralized or "hosted" wallet. DEXs are operated by self-executing agreements written in code, known as "smart contracts," which automate the trading process. DEXs will algorithmically track the prices of various virtual currencies and often leverage locked reserves of virtual currencies (or other digital assets). These locked reserves are known as "liquidity pools," and they are often used to facilitate trades. DEXs are built on blockchains that support smart contracts, including Ethereum, and often levy fees for their services.

26. **Transaction Fee**: A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (e.g., Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

27. **Stablecoins**: Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether (also known as USDT) is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

28. **Tether:** Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

29. **Ethereum**: Ethereum ("ETH") is a cryptocurrency that is open source, public, has a blockchain, and is distributed on a platform that uses "smart contract" technology. The public ledger is the digital trail of the Ethereum blockchain, which allows anyone to track the movement of ETH.

30. **Tron**: Tron ("TRX") is a cryptocurrency that is open source, public, has a blockchain, and is distributed on a platform that uses "smart contract" technology. The public ledger is the digital trail of the Tron blockchain, which allows anyone to track the movement of TRX.

## STATEMENT OF FACTS

### Background on Cryptocurrency Investment Fraud

31. The FBI is investigating cryptocurrency investment fraud (CIF) schemes, often referred to as "pig-butchering," a term derived from the Chinese-language word used to describe this scheme and its treatment of victims. In 2024, more than 41,000 complainants reported being victimized by CIF schemes to the FBI, resulting in $5.8 billion in reported losses.[2] CIF schemes are largely run out of scam centers based in southeast Asia, but have expanded to other continents.

32. CIF schemes begin by criminals contacting potential victims through seemingly misdirected text messages, dating applications, social media sites, or other online platforms. Next, using various means of manipulation, the criminal gains the victim's affection and trust.

[2] *See* Fed. Bureau of Investigation, *Internet Crime Report 2024* at 36, https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

33. Once that trust is established, the criminal recommends cryptocurrency investment by touting their own, or an associate's, success in the field. Investment methods vary, but a common tactic is to direct a victim to a fake investment platform hosted on a website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The subject assists the victim with opening a cryptocurrency account, often on a U.S.- based virtual currency exchange, and then walks the victim through transferring money from a bank account to that cryptocurrency account. Next, the victim will receive instructions on how to transfer their cryptocurrency assets to the fake investment platform. On its surface, the platform shows lucrative returns, encouraging further investment. In reality, all deposited funds are routed to a cryptocurrency address controlled by the criminals.

34. Throughout the process of the victims depositing their funds into these fake investment platforms, the subjects will encourage further investments until the victim has depleted their financial accounts. Oftentimes, the subject will attempt to continue the scheme by coaching victims on taking out loans against their homes or to borrow money from friends and family. Inevitably, these victims eventually run out of money and make attempts to withdraw their funds. However, victims are unable to do so and are provided various excuses as to why. For example, subjects will often levy a fake "tax" requirement, stating taxes must be paid on the proceeds generated from the platform. This is just an eleventh-hour effort by subjects to elicit more money from victims; ultimately, victims are locked out of their accounts and lose all their funds. Even when victims procure enough funds to pay these "taxes," the subjects will continue to concoct new excuses and fees for victims to pay.

**L.M. – Initial Victim**

35. In or around November 2025, the FBI's Washington Field Office learned of a CIF victim, L.M., who reported losing approximately $800,000.00 worth of cryptocurrency.

36. L.M. connected with a woman by the name of "Alicia" ("ALICIA") through a random text message around January 2025. Shortly after L.M. and ALICIA began chatting, ALICIA requested that they move their conversation onto the encrypted messaging application Telegram, a common CIF scheme tactic as mentioned above. The two continued to message and began to develop a romantic relationship.

37. ALICIA claimed to live in New York City and sent L.M. a copy of her purported driver's license. ALICIA ultimately introduced the concept of investing through cryptocurrency to L.M. ALICIA told L.M. that she was an experienced advisor and helped people learn how to invest using cryptocurrency. ALICIA further told L.M. that he would be investing in a company called "CoinZoom." ALICIA claimed to have inside knowledge of when to time the trades that L.M. would be making as part of L.M.'s investment.

38. L.M. opened an account at the cryptocurrency exchange Coinbase and used the Coinbase account to make what L.M. believed to be investment payments. ALICIA provided L.M. with a cryptocurrency address for L.M. to send L.M.'s funds. Based on the FBI's analysis of L.M.'s cryptocurrency transactions, L.M sent approximately $760,131.89 in cryptocurrency to this address.

39. L.M. attempted to withdraw L.M.'s "invested" funds but was not able to do so. L.M. was told that he had been charged with money laundering and tax evasion and that L.M. needed to pay additional funds to remedy the situation. L.M. was not able to withdraw any of his funds and lost approximately $760,131.89.

**Flow Of L.M.'s Funds**

40. Victim L.M. reported losing approximately $800,000 over the course of the scam. A review of L.M.'s transaction history identified at least 21 transactions initiated by L.M. in which L.M. sent ETH to address 0xf36708efc88a3621954cc0e67f39e8bcf2367ef6 (0xf36). In total, across the 21 transactions, L.M. sent approximately 376.8308769 ETH, valued at about $760,131.89 at the time of the transfers.

41. The FBI, using commercial blockchain analytics tools and open-source blockchain explorers, traced all 21 of L.M.'s transactions. Of the 21 transactions, 20 transactions were conducted on the Ethereum blockchain and one transaction was conducted on the BASE blockchain. The funds contained within the sole transaction conducted on the BASE blockchain were laundered using very similar methods used to launder the funds sent in transactions on the Ethereum blockchain (discussed in further detail below). However, the BASE blockchain funds were ultimately deposited into a different address and were thus not comingled with the remainder of L.M.'s funds in the Subject Addresses.

42. For all twenty of the transactions conducted by L.M. on the Ethereum blockchain, following each transaction, within minutes to hours, the funds sent by L.M. were quickly withdrawn and sent to one of two different addresses.

43. Once deposited to the two aforementioned addresses, L.M.'s funds were comingled with additional funds, swapped from one cryptocurrency type to another, bridged from the Ethereum blockchain to the Tron blockchain, eventually being sent to one or more of the three Subject Addresses. In total, L.M.'s funds were sent through or to some combination of 18 different cryptocurrency addresses, including the Subject Addresses. A table of the transactions conducted by L.M. on the Ethereum blockchain, and the subsequent withdrawals from 0xf36 is below, illustrating the quick turn between deposits and withdrawals to the address[3]:

| Date | Address | IN/OUT | Amount (ETH) | Amount USD |
|---|---|---|---|---|
| 2025-01-28 02:43:11Z | 0xf367 | IN | 1.49906047 | $ 4,771.63 |
| 2025-01-28 03:03:47Z | 0x324f3c17215f658a688b5e7f 6cf316c92c076b17 (0x324f) | OUT | 1.498907793 | $ 4,771.14 |
| 2025-02-11 01:43:11Z | 0xf367 | IN | 9.37348133 | $ 24,961.21 |
| 2025-02-11 02:05:35Z | 0x324f | OUT | -9.37347744 | $ 24,961.20 |
| 2025-02-19 02:27:11Z | 0xf367 | IN | 18.32837787 | $ 48,963.03 |
| 2025-02-19 02:40:23Z | 0x324f | OUT | -18.32835756 | $ 48,962.98 |
| 2025-03-20 02:55:11Z | 0xf367 | IN | 0.23926495 | $ 492.81 |
| 2025-03-20 03:14:35Z | 0x324f | OUT | -0.239253838 | $ 492.78 |
| 2025-03-24 20:51:11Z | 0xf367 | IN | 23.20534671 | $ 46,488.05 |
| 2025-03-24 21:14:23Z | 0x324f | OUT | -23.20533207 | $ 46,488.02 |

[3] The "IN/OUT column in all tables in this complaint represent deposits ("in") and withdrawals ("out") of the virtual currency addresses.

| | | | | |
|---|---|---|---|---|
| 2025-03-25 21:25:11Z | 0xf367 | IN | 23.43179162 | $ 48,673.53 |
| 2025-03-25 21:27:11Z | 0x324f | OUT | -23.43177905 | $ 48,673.50 |
| 2025-03-27 16:40:11Z | 0xf367 | IN | 48.39855411 | $ 97,264.03 |
| 2025-03-27 16:44:23Z | 0x324f | OUT | -48.39854013 | $ 97,264.00 |
| 2025-04-03 18:48:11Z | 0xf367 | IN | 8.16841706 | $ 14,649.84 |
| 2025-04-03 18:50:47Z | 0x324f | OUT | -8.16839502 | $ 14,649.80 |
| 2025-04-12 22:13:11Z | 0xf367 | IN | 1.42927566 | $ 2,239.90 |
| 2025-04-12 22:23:11Z | 0x324f | OUT | -1.429271845 | $ 2,239.89 |
| 2025-04-23 02:53:11Z | 0xf367 | IN | 27.73951314 | $ 48,768.23 |
| 2025-04-23 03:09:59Z | 0x324f | OUT | -27.73949343 | $ 48,768.19 |
| 2025-04-24 00:15:59Z | 0xf367 | IN | 27.02763458 | $ 48,544.28 |
| 2025-04-24 00:22:47Z | 0x324f | OUT | -27.02762681 | $ 48,544.27 |
| 2025-04-24 20:08:11Z | 0xf367 | IN | 27.49522978 | $ 49,384.13 |
| 2025-04-24 20:16:23Z | 0x324f | OUT | -27.495224 | $ 49,384.12 |
| 2025-04-25 22:32:11Z | 0xf367 | IN | 27.05304016 | $ 47,777.00 |
| 2025-04-25 22:34:59Z | 0x324f | OUT | -27.05303461 | $ 47,776.99 |
| 2025-04-28 18:20:11Z | 0xf367 | IN | 27.48642137 | $ 49,298.05 |

| | | | | |
|---|---|---|---|---|
| 2025-04-28 18:23:35Z | 0x733f20d279a483923dbeea379f6370cb64c73754 (0x733f) | OUT | -27.48639512 | $ 49,298.01 |
| 2025-04-29 20:21:11Z | 0xf367 | IN | 26.76971553 | $ 48,185.57 |
| 2025-04-29 20:28:11Z | 0x733f | OUT | -26.76971145 | $ 48,185.56 |
| 2025-04-30 16:37:11Z | 0xf367 | IN | 6.62154843 | $ 11,911.68 |
| 2025-04-30 16:43:47Z | 0x733f | OUT | -6.621534985 | $ 11,911.65 |
| 2025-05-08 21:53:11Z | 0xf367 | IN | 5.34800451 | $ 9,689.22 |
| 2025-05-08 22:05:11Z | 0x733f | OUT | -5.347734697 | $ 9,688.73 |
| 2025-05-21 00:41:11Z | 0xf367 | IN | 19.25442567 | $ 48,588.21 |
| 2025-05-21 00:56:23Z | 0x733f | OUT | -19.2544792 | $ 48,588.35 |
| 2025-05-28 01:26:11Z | 0xf367 | IN | 18.34231333 | $ 48,836.74 |
| 2025-05-28 01:37:35Z | 0x733f | OUT | -18.34229371 | $ 48,836.68 |
| 2025-05-31 00:30:11Z | 0xf367 | IN | 5.78673517 | $ 14,637.04 |
| 2025-05-31 00:36:11Z | 0x733f | OUT | -5.786700168 | $ 14,636.95 |
| **TOTAL** | | | **352.9981515** | **$714,124.17** |

44. As previously explained, following the above transactions, the funds traceable to L.M. were then sent through a series of additional cryptocurrency addresses, including swapping and bridging services, which transferred the funds into other virtual currencies and/or onto other blockchains. A portion of the funds traceable to L.M. were either sent to a separate group of addresses where the funds could not be recovered or were sent through the Subject Addresses but were no longer located within them when the Subject Addresses were frozen by Tether on or about July 18, 2025. Of the approximately $714,124.17 lost by L.M., the FBI identified at least $396,106 in virtual currency from L.M. deposited into the Subject Addresses, where it currently remains.

45. A visual depiction of the total movement of L.M.'s funds (Figure 1) is below:


Victim Coinbase
0xf367...7ef6
czoomkap.vip
0x324f...6b17
czoomkap.vip
Tokenlon
0x733f...3754
czoomkap.vip
0x9d24...5771
czoomkap.vip
0x7fd5...01e7
czoomkap.vip
0xfd6e...8e6b
0xfc99...ee9f
OKX Dex
0x0d7d...f1fa
0x22ce...b70a
BitKeep
0x1123...d1c9
Bitget
TPwezU...Et5s
Bridgers
THBtNB...713M
BitKeep
TSvPGz...TcJi
TWPJEr...CqJn
TRHFJz...RtyX
TJNWts...6L2m
TXD8qN...r8GB
TJ2Ko8...BiPX
TGx6QK...8qW2
TWGpSC...hnVQ
TXUdpq...ufhG
TAK4tf...6H9M
SUBJECT ADDRESS 2
SUBJECT ADDRESS 3
SUBJECT ADDRESS 1

46. Each of the Subject Addresses hold the following amount of funds traceable to the losses of L.M.:

| | |
|---|---|
| Subject Address 1 | $ 292,177.00 |
| Subject Address 2 | $ 101,570.00 |
| Subject Address 3 | $ 2,359.00 |
| TOTAL | $ 396,106.00 |

47. The above flow of funds is indicative of money laundering using cryptocurrency. At each stage above, various methods commonly used by individuals laundering money were used to attempt to thwart law enforcement's ability to trace, and ultimately recover, any illicit proceeds. Those methods include:

a. Use of Unattributable "0-Level" Initial Deposit Addresses (e.g., 0xf36). 0-Level addresses, a term used to describe the virtual currency addresses that scammers direct victims to use for their "investment" deposits, are regularly used in CIF scams for individual victims, or only a few victims who are not aware of where their funds are actually being sent. By diversifying 0-level initial deposit addresses, scammers are less likely to be exposed by the re-use of these initial deposit addresses, which are the only addresses victims are usually transacting with, and often the only ones the victims report to law enforcement.

b. Utilizing Exchange Services to Swap for Stablecoins, Especially USDT. CIF scammers involved in laundering victims' funds regularly exchange or swap the non-stablecoin cryptocurrencies that victims send for stablecoins, specifically USDT. CIF scammers frequently utilize various exchange services to conduct these swaps, including services

such as Tokenlon and Bitget Swap, as is the case with the scheme described in this affidavit. According to investigators, money launderers are particularly drawn to USDT because of its high liquidity and stability compared to other more volatile cryptocurrencies. Additionally, USDT is compatible on several different blockchains, which makes it easier to move USDT funds across blockchains to further obfuscate the nature, source, control, and/or ownership of criminal proceeds.

c. High Velocity Flow of Funds to Consolidation Wallet. Once deposited into the 0-Level Address, it is common for the funds to be transferred quickly from address to address before reaching one or more consolidation wallets, where the funds will rest for a longer period, allowing criminals time to comingle those funds with other illicit gains before moving the funds again from the consolidation wallet(s) towards a cash-out point where they can convert the pool of funds to fiat currency. This can clearly be shown in 0xf36, where L.M.'s deposits were withdrawn in near identical amounts within hours or minutes (in one case as quickly as approximately four minutes) and sent to other addresses to be laundered further.

d. Use of Consolidation Wallet to Comingle Funds. Defined as the "layering" stage of money-laundering, funds derived from multiple victims are routed to the same address, where they are comingled, consolidated, and transferred together downstream. Criminals use consolidation wallets to obfuscate the source of funds and complicate tracing efforts by investigators. L.M.'s funds were comingled at almost every step and ultimately passed through multiple consolidation wallets containing other victims' funds before being sent to, or passing through, the Subject Addresses.

e. Bridging to the Tron Blockchain – The infrastructure used by many money laundering networks exists on multiple blockchains. However, due to the comparatively low

transaction fees and widespread decentralized infrastructure, the Tron blockchain has been heavily used by CIF Scams and money laundering networks to quickly and effectively launder and cash out proceeds obtained from illicit acts. This has been so prevalent that many US based cryptocurrency exchanges, such as Coinbase, have blocked their users from directly sending funds to addresses on the Tron blockchain. As a result of this, CIF scammers often are forced to accept funds on other blockchains, such as Ethereum and Bitcoin, before bridging (also known as "chain hopping") funds to the Tron blockchain, where the funds can be put into the large and well-established money laundering ecosystem that exists on Tron.

48. There is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers using these methods as seen in the transaction history explained above. Whether transferring BTC or, in this case, ETH and USDT, each individual cryptocurrency transfer costs money. For USDT, that cost comes through the payment of transactions fees, or "gas" fees. It is reasonable for legitimate transfers to assume that businesses and individuals would strive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible. Furthermore, each transaction causes delay, defeating one of the key attributes of cryptocurrency as a quick means of exchange.

49. Based on this evidence, unknown subject(s) are believed to have orchestrated a CIF scheme against L.M. and other victims, and then laundered their funds, and funds of other, unidentified victims into the Subject Addresses.

**Identification Of Additional Victims**

50. The FBI performed blockchain analysis to trace transactions backwards from the Subject Addresses to eventually identify other 0-Level addresses not shown in Figure 1. It was determined that these 0-Level addresses received deposits from multiple wallets hosted at the virtual currency exchanges Coinbase, Crypto.com, Kraken, and others. Investigators sent legal process to the exchanges to identify likely victim account holders. Blockchain analysis was not conducted on all activity of the Subject Addresses, given the transaction volume of some addresses.

51. By reviewing records from virtual currency exchanges such as Coinbase, Kraken, and Crypto.com, complaints submitted to the FBI's Internet Crime Complaint Center ("IC3"), and subsequent interviews with identified exchange account holders, investigators confirmed that the Subject Addresses contained additional victim proceeds. The table included with paragraph 63 of this affidavit lists these additional victims' funds that are traceable to the Subject Addresses.

52. One such victim is D.G., who submitted an IC3 complaint regarding a CIF scam, and reported losing $617,000.00. Each transfer initiated by D.G. was sent to the same address, 0x37ef03f6e9049e468eaee7183c6c2c01d88cb4fa (0x37ef). Following each transaction, within minutes to hours, the funds sent by D.G. were quickly withdrawn and sent to one of three different addresses.

53. From there, D.G.'s funds were comingled with additional funds, swapped from one cryptocurrency type to another, bridged from the Ethereum blockchain to the Tron blockchain, and eventually sent to the three Subject Addresses. A table of the transactions conducted by D.G., and the subsequent withdrawals from 0x37ef is below, illustrating the quick turn between deposits and withdrawals to the address:

| Date | Address | IN/OUT | Amount | Amount USD |
|---|---|---|---|---|
| 2025-03-02 23:29:47Z | 0x37ef | IN | 4.18132593 | $ 9,257.97 |
| 2025-03-02 23:37:35Z | 0x565a53b1ca446a27504b1b34e5e5ecd6af8a149e | OUT | -4.179907016 | $ 9,254.82 |
| 2025-03-12 23:34:11Z | 0x37ef | IN | 3.60312825 | $ 6,932.98 |
| 2025-03-13 00:16:59Z | 0x10f9061f12f1581c394ec18422e9ef298f8061d6 (0x10f9) | OUT | -3.604509865 | $ 6,872.70 |
| 2025-04-07 19:22:23Z | 0x37ef | IN | 47.09190919 | $ 74,350.12 |
| 2025-04-07 19:35:47Z | 0x10f9 | OUT | -47.08334541 | $ 74,336.59 |
| 2025-04-17 17:32:11Z | 0x37ef | IN | 90.64119627 | $ 143,023.11 |
| 2025-04-17 17:38:59Z | 0x10f9 | OUT | -90.64969484 | $ 143,036.52 |
| 2025-04-25 20:04:11Z | 0x37ef | IN | 45.88784743 | $ 81,040.19 |
| 2025-04-25 20:08:35Z | 0x10f9 | OUT | -45.85502714 | $ 80,982.23 |
| 2025-05-06 21:03:59Z | 0x37ef | IN | 101.6685706 | $ 184,814.17 |
| 2025-05-06 21:14:59Z | 0x308213f0445a00651261ac92660ff6f4b9e90c02 (0x3082) | OUT | -101.6780532 | $ 184,831.40 |
| 2025-05-21 16:23:11Z | 0x37ef | IN | 42.40488949 | $ 107,008.01 |
| 2025-05-21 16:29:11Z | 0x3082 | OUT | -42.42803218 | $ 107,066.41 |
| 2025-05-30 17:18:11Z | 0x37ef | IN | 3.7951552 | $ 9,989.13 |
| 2025-05-30 17:28:47Z | 0x3082 | OUT | -3.7950626 | $ 9,988.88 |
| **TOTAL** | | | **339.2740224** | **$ 616,415.67** |

54. Following the above transactions, as was the case with L.M.'s funds, D.G.'s funds were rapidly withdrawn, sent through a series of multiple intermediary and/or consolidation addresses, converted to USDT, bridged from the Ethereum Blockchain to the Tron Blockchain, and eventually deposited into one or more of the Subject Addresses. A visual depiction of the total movement of D.G.'s funds (Figure 2) is below:


SUBJECT ADDRESS 3
SUBJECT ADDRESS 2
SUBJECT ADDRESS 1
0xa9d1...3e43
Coinbase
0xb5d8...f511
Coinbase
0x37ef...b4fa
Level Up
Tokenlon
0x565a...149e
0x10f9...61d6
Tokenlon
Tokenlon
0x3082...0c02
0xbaed...5b75
czoomkap.vip
0x9d24...5771
czoomkap.vip
110 ETH (2 transfers)
0xfc99...ee9f
OKX Dex
0x7fd5...01e7
czoomkap.vip
0xfd6e...8e6b
TPwezU...Et5s
Bridgers
TLRQUr...oM2J
870,060 USDT
Mar 16, 2025 4:59:51 AM
TXUdpq...ufhG
TWGpSC...hnVQ
TWPJEr...CqJn
2,520,000 USDT
Jun 4, 2025 4:37:42 AM
TJ2Ko8...8iPX
TRHFJz...fRyX
TJNWts...6L2m
0x1123...d1c9
Bitget
TH8tNB...713M
BitKeep
TSvPGz...TcJi
TXD8qN...r8GB
1,240,000 USDT
May 3, 2025 3:07:12 AM
TGx6QK...BqW2
3,300,000 USDT
May 3, 2025 12:21:51 PM
TAK4tf...6H9M

55. Not only were D.G.'s funds laundered in a very similar manner to those of L.M., but portions of D.G.'s funds were laundered through some of the same cryptocurrency addresses as L.M.'s funds, and in some cases, D.G.'s funds were comingled with L.M.'s funds and sent within the same transactions.

56. Similar to L.M., identified victims S.R. and A.P., who were identified by tracing funds back from the Subject Addresses, met an individual online named "Alicia" who directed them to invest in the entity "CoinZoom". "Alicia" also directed both S.R. and A.P. to the fake investment website czoomhmc.vip. Both S.R. and A.P. realized they were victims in a scam when they attempted to withdraw their funds, at which point both S.R. and A.P. were told that they had to pay additional taxes and fees in order to complete any withdrawal. A.P. was able to contact the real CoinZoom[4], who informed A.P. that the website they were using was a scam website and not affiliated with CoinZoom. In total, S.R. reportedly invested approximately $500,000 and A.P. reportedly invested approximately $600,000. Neither S.R. nor A.P. have been able to recover any of their investment. S.R.'s funds are traceable to all Subject Addresses, and A.P.'s funds are traceable to Subject Addresses 2 and 3.

57. Another identified victim, C.J., learned about several "investment" opportunities after being added to WhatsApp group messages. C.J. was encouraged to invest in a fake version of the MEXC exchange and invest in the "Ethereum Mining Pool." C.J. believed C.J. was investing in this mining pool, however, it was all part of a CIF scheme. Once C.J. tried to withdraw C.J.'s funds, C.J. was told they had to pay taxes. In total, C.J. reportedly invested approximately $900,000 and has only been able to recover $1,500 of their investment. C.J.'s funds are traceable to all of the Subject Addresses.

[4] CoinZoom is a U.S.-based virtual currency exchange.

58. Identified victims A.V., S.A., and T.C. all met women online and developed romantic virtual relationships with the scammers. The scammers ultimately introduced the concept of investing through cryptocurrency to A.V., S.A., and T.C. The scammers also walked A.V., S.A., and T.C. through the process of opening a cryptocurrency exchange account and making "investment payments." After making these payments, A.V., S.A., and T.C. all eventually attempted to withdraw their funds, at which point they were told to pay additional money in order to make any withdrawal. A.V. reportedly invested approximately $100,000, S.A. reportedly invested approximately $70,000, and T.C. reportedly invested approximately $25,000. Neither A.V., S.A., nor T.C. have been able to recover any of their investments. A.V. and S.A.'s funds are traceable to Subject Address 1. T.C.'s funds are traceable to Subject Addresses 2 and 3.

59. Victims G.D., A.S., and L.W. all met women online and were directed to the fraudulent trading platform "Oanda Paxos." The scammers instructed G.D., A.S., and L.W. on how to make their investments and directed them to fraudulent websites. G.D., A.S., and L.W. reportedly invested $500,000, $85,000, and $22,000, respectively as part of CIF scams, and all have been unable to recover their investments. G.D. and L.W.'s funds are traceable to Subject Address 1, and A.S.'s funds are traceable to Subject Addresses 2 and 3.

60. To date, based on back-tracing performed from the Subject Addresses and records obtained from virtual currency exchanges, the FBI has identified at least 200 individuals who are likely victims of CIF schemes whose funds were laundered using at least part of the network of addresses described in this affidavit. Of these, the FBI has conducted interviews with 15 individuals and reviewed IC3 complaints from an additional 19 individuals and confirmed their status as victims based on virtual currency exchange records. Funds traceable to victims discussed above have all been traced to the Subject Addresses.

61. Due to the fact that the FBI has not interviewed all 200 plus likely victims or located IC3 complaints filed by them, it is difficult to know the total loss across all victims.

62. Among the 34 individuals that the FBI has interviewed and/or reviewed IC3 complaints from, the FBI is aware of $7,164,000 in reported losses due to reported CIF scams.

63. Displayed below is a table that outlines the approximate reported loss amounts from these 34 confirmed victims whose funds were traced to the Subject Addresses, and to which of the Subject Addresses the funds were eventually sent. Note that the FBI has not been able to verify that each victim indeed lost this amount, and not all values take into account the initial minimal amounts that victims may have been able to withdraw before they were ultimately blocked from making any additional withdrawals, due to the FBI not knowing and/or being able to confirm the value of such withdrawals. Furthermore, due to the heavy comingling of the funds traceable to each victim, there are instances in which victim funds may have been sent to more than one of the Subject Addresses. In those instances, multiple Subject Addresses are listed below.

| Victim | Reported Loss | Subject Addresses (SA) |
|---|---|---|
| L.M. | $ 800,000.00 | SA 1, 2, 3 |
| C.J. | $ 900,000.00 | SA 1, 2, 3 |
| K.N. | $ 400,000.00 | SA 2, 3 |
| S.R. | $ 500,000.00 | SA 1, 2, 3 |
| N.C. | $ 250,000.00 | SA 2, 3 |
| A.P. | $ 600,000.00 | SA 2, 3 |
| T.C. | $ 25,000.00 | SA 2, 3 |
| A.V. | $ 100,000.00 | SA 1 |
| G.M. | $ 400,000.00 | SA 2, 3 |
| S.A. | $ 70,000.00 | SA 1 |
| S.D. | $ 200,000.00 | SA 1 |

| | | |
|---|---|---|
| J.M. | $ 100,000.00 | SA 1 |
| A.H. | $ 200,000.00 | SA 2, 3 |
| M.M. | $ 50,000.00 | SA 1 |
| G.D. | $ 500,000.00 | SA 1 |
| N.L. | $ 135,000.00 | SA 1 |
| D.W. | $ 60,000.00 | SA 1 |
| R.V. | $ 120,000.00 | SA 2, 3 |
| N.K. | $ 12,000.00 | SA 1 |
| L.W. | $ 22,000.00 | SA 1 |
| K.P. | $ 10,000.00 | SA 1 |
| D.G. | $ 617,000.00 | SA 1, 3 |
| M.S. | $ 32,000.00 | SA 1 |
| I.P. | $ 85,000.00 | SA 2, 3 |
| M.P. | $ 400,000.00 | SA 1 |
| A.S. | $ 85,000.00 | SA 2, 3 |
| E.B. | $ 1,000.00 | SA 1 |
| D.K. | $ 147,000.00 | SA 1 |
| F.M. | $ 158,000.00 | SA 1 |
| J.K. | $ 140,000.00 | SA 1 |
| P.S. | $ 45,000.00 | SA 2, 3 |
| M.T. | Not Reported | SA 1 |
| J.D. | Not Reported | SA 1 |
| T.R. | Not Reported | SA 2, 3 |
| **Total** | $ 7,164,000.00 | |

64. Of the losses reported by the 34 verified victims, the FBI has traced approximately $2,033,867.16 in victim losses to the Subject Addresses.

65. To date, the FBI has back-traced a total of approximately $4,147,412.25 likely losses attributable to the more than 200 individuals, including those who have yet to be interviewed and/or have not submitted IC3 complaints, who are likely victims of CIF schemes.

66. The more than 200 potential victims sent funds to approximately 298 different 0-Level addresses, which ultimately had some of their funds transferred to the Subject Addresses. As was the case with the transfers related to L.M. and D.G., following the transfer from victim exchange accounts to the various 0-Level addresses, the funds were subsequently swapped from ETH to USDT via Tokenlon, sent through a series of one or more of about 94 total consolidation addresses, bridged from the Ethereum blockchain to the Tron Blockchain via blockchain bridges BitKeep or Bridgers, and sent through a series of one or more of about 11 addresses, before ultimately being sent through or deposited into one or more of the Subject Addresses. Due to the sheer volume and amount of 0-Level and consolidation addresses, an abridged visual representation of the flow of these funds can be seen below:


200+ Victims across 10 Cryptocurrency Exchanges
COINBASE
CRYPTO.COM
ROBINHOOD
KRAKEN
GEMINI
CASH APP
UPHOLD
BINANCE US
ZERO HASH
MOONPAY
Tokenlon
298 Level 0 Addresses
94 Consolidation Addresses
Tokenlon
0x9d24...5771
czoomkap.vip
0xca46...79a4
czoomkap.vip
0xbaed...5b75
czoomkap.vip
473.9 ETH (3 transfers)
4,494,061.593892 USDT (9 transfers)
0x7fd5...01e7
czoomkap.vip
Bitget/BitKeep Swap
Bridgers
TLRQUr...oM2J
TSvPGz...TcJi
TWPJEr...CqJn
TCnjQu...ceSz
2,880,000 USDT (3 transfers)
1,240,000 USDT (2 transfers)
2,520,000 USDT
Jun 4, 2025 4:37:42 AM
610,912.613746 USDT
Jun 29, 2025 6:49:09 AM
8,059,800 USDT (12 transfers)
TJ2Ko8...8iPX
252,355 USDT
Jun 11, 2025 3:36:21 AM
1,100,000 USDT
Apr 18, 2025 11:17:15 PM
TJNWts...6L2m
TDCjyx...oL19
TEbs6X...Wv5H
TXD8qN...r8GB
3,070,000 USDT (2 transfers)
252,511.057 USDT
Jul 4, 2025 4:57:42 AM
1,850,000 USDT
May 3, 2025 3:06:24 AM
1,240,000 USDT
May 3, 2025 3:07:12 AM
647,756 USDT
Jul 4, 2025 4:58:33 AM
463,678 USDT (2 transfers)
4,410,000 USDT (2 transfers)
TRHFJz...fRyX
TGx6QK...BqW2
2,400,000 USDT
Jul 4, 2025 4:59:57 AM
3,300,000 USDT
May 3, 2025 12:21:51 PM
481,000 USDT
Mar 18, 2025 6:50:33 AM
TXUdpq...ufhG
TAK4tf...6H9M
TWGpSC...hnVQ
SUBJECT ADDRESS 3
SUBJECT ADDRESS 1
SUBJECT ADDRESS 2

## Freezing of the Subject Addresses

67. On or about July 18, 2025, the FBI requested that Tether voluntarily freeze the USDT held within the Subject Addresses.

68. Tether has the ability to "freeze" USDT associated with unhosted wallet addresses, allowing the addresses to continue to receive USDT, but barring them from sending USDT.

69. On or about July 19, 2025, Tether confirmed that the Subject Addresses had been voluntarily frozen. In total, approximately 5,018,405.451351 USDT remains frozen across the three Subject Addresses.

70. In total, of the approximately 5,018,405.451351 USDT held by the three Subject Addresses, at least $4,147,412.25 is traceable to confirmed and suspected victims identified by the FBI as a result of back-tracing.

## Claimants of Subject Addresses

71. The Subject Addresses are all unhosted wallet addresses where the owners cannot be easily identified. After implementing this freeze, the company Tether received messages from individuals claiming ownership of the frozen addresses, as is common in these situations. Tether's practice is to notify the law enforcement entity who initiated the freeze and to refer the claimant to a contact provided by that entity. Following the freeze of the three Subject Addresses, Tether was contacted by claimants for Subject Addresses 2 and 3.

72. As described below, the individuals who contacted Tether were directed to and contacted the FBI. Investigators offered the claimants who contacted the FBI the opportunity to self-identify and explain their use of the Subject Address in question.

73. On or about July 26, 2025, Tether alerted the FBI that an individual had contacted them claiming ownership of Subject Address 2. Tether added that the person messaged them from under the name/alias "Eric Bu." Tether referred "Eric Bu" to the FBI's provided email address. Also on or about July 26, 2025, an individual using the same address contacted the FBI and identified themselves as "Aung Myint Soe" ("Soe"). Soe identified himself as the legal representative of Yazheng Electronic Technology Company Limited, the owner of Subject Address 2. Soe included pictures of his Myanmar ID card, a picture of himself, and a picture of the business registration for Yazheng Electronic Technology Company Limited. Soe also indicated that Yazheng Electronic Technology Company Limited was an innocent third party who unknowingly received USDT from a suspicious source. On or about July 30, 2025, investigators responded with a list of questions for Soe to self-identify and explain the use of this address.

74. In response to the questions from the investigators, Soe represented that he was the sole shareholder of Yazheng Electronic Technology Company Limited located in Mandalay, Myanmar. Soe indicated he is involved in the wholesale and retail sale of electronic devices. Soe further indicated that Yazheng Electronic Technology Company Limited did not have an official website. Soe provided pictures of miscellaneous electronic items, including cell phones and computer monitors.

75. On or about August 1, 2025, investigators responded with an additional list of questions. In response, Soe indicated that he uses Subject Address 2 to receive payments from customers and pay suppliers of electronics. Soe also provided a picture of himself holding his Myanmar ID card and a picture of himself holding a piece of paper with the letters "TWGPSC," the first six characters in Subject Address 2.

76. In response to additional rounds of questions from investigators, Soe claimed that he did not possess any information about his customers, as they all made purchases in-store. SOE further claimed that his main product suppliers are located in Yangon, Myanmar, but Soe did not have any contact information for his suppliers.

77. On or about October 30, 2025, investigators inquired with Soe if he would be willing to participate in an online video call with investigators to answer additional questions. Soe indicated he would be willing to participate in an online video call with investigators.

78. On or about November 14, 2025, investigators attempted to interview Soe via online video call. Approximately 10 minutes after the scheduled start time of the meeting, investigators emailed Soe to determine if he still planned to join the meeting. Soe replied and indicated he was having trouble connecting to and joining the meeting. Investigators waited approximately 45 minutes before terminating the online video call, which Soe never joined.

79. On or about November 21, 2025, investigators again attempted to interview Soe via online video call. Approximately 10 minutes after the scheduled start time of the meeting, investigators emailed Soe to determine if he still planned to join the meeting. Investigators waited approximately 20 minutes before terminating the online video call, which Soe never joined. Subsequent to the termination of the online video call, Soe emailed investigators and indicated that his internet was too unstable to join the meeting.

80. On or about July 31, 2025, and on or about August 8, 2025, respectively, "Jessica Smith" contacted the FBI claiming ownership of Subject Address 2. On or about August 7, 2025, investigators responded with a list of questions for "Jessica Smith" to self-identify and explain the use of this address but received no response to those questions.

81. On or about July 26, 2025, "Dianna Shanahan" contacted the FBI claiming ownership of Subject Address 3. On or about August 7, 2025, investigators responded with a list of questions for "Dianna Shanahan" to self-identify and explain the use of this address but received no response.

82. There are social media accounts and cryptocurrency related websites that track addresses that are frozen. This enables individuals who do not own or operate a specific virtual currency address to be made aware that it was frozen, and to message Tether and the FBI out of curiosity or a hopeful attempt to secure the funds for themselves when they are not in fact the owners of the funds.

**COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY**

**(18 U.S.C. § 981(a)(1)(C))**

83. The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

84. Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

**COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY**

**(18 U.S.C. § 981(a)(1)(A))**

85. The Defendant Property constitutes property involved (a) domestic and international concealment of money laundering transactions committed in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i), (b) a conspiracy to engage in money laundering, committed in violation of Title 18, United States Code, Section 1956(h).

86. Accordingly, the Defendant Funds are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

**PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: */s/ Rick Blaylock, Jr.*
Rick Blaylock, Jr.
Assistant United States Attorney
Asset Forfeiture Coordinator
Texas Bar Number 24103294
United States Attorney's Office
601 D Street NW
Washington, D.C. 20530
Telephone: 202-252-6765
Email: rick.blaylock.jr@usdoj.gov
Counsel for the United States

**VERIFICATION**

I, Jeffrey Pearson, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 22nd day of September 2026.

Jeffrey P. Pearson

Jeffrey Pearson
Special Agent
Federal Bureau of Investigation